UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION AT FRANKFORT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. |
| | ) | 3:08-cr-31-JMH |
| v. | ) | |
| | ) | |
| MICHAEL D. SMITH, et al., | ) | |
| | ) | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | ) | |

\*\*   \*\*   \*\*   \*\*   \*\*

This matter is before the Court upon Defendants Michael D. Smith and Christopher Cello Smith's Motions for New Trial [DE 523 and 528]. The United States of America filed a Response [DE 546], stating its objections, and Defendants filed Replies in further support of their Motions [DE 562 and 564]. The Court convened a hearing on the Motion on May 31, 2011, and heard arguments from counsel. At the conclusion of that hearing, the Court took the parties' Motions under advisement and granted the moving Defendants leave to file supplemental briefs in support of those portions of their Motions requesting an evidentiary hearing. The moving Defendants have filed their Supplemental Memoranda [DE 593 and 595; *see also* DE 602], and the United States of America has filed a Response in Opposition to the Defendants' Motion for an Evidentiary Hearing [DE 597]. In their Motions, the moving Defendants argue that (1) an evidentiary hearing is necessary before the Court makes a decision with respect to their Motions for a new trial, (2) that

-1-

a new trial is warranted because the pre-trial disclosure requirements of *Brady v. Maryland* were violated with respect to the government's knowledge of Mark Irwin's involvement with Summit Energy Corp., and (3) that a new trial is warranted by virtue of newly discovered evidence of Mark Irwin's involvement with Summit Energy Corp., perjury committed during his testimony at trial, as well as his conviction for perjury or misstatements made on his form CJA-23 in the present matter.

The Court being adequately advised, these Motions are ripe for decision. For the reasons stated below, these Motions will be denied.

**I. Background**

Mark Irwin was indicted in Criminal Action No. 3:08-cr-31 as a co-conspirator with moving Defendants and others, charged with committing mail and wire fraud. Ultimately, he agreed to cooperate with the government and testify on its behalf at trial in exchange for a plea agreement. Under that plea agreement, Irwin agreed to testify truthfully in the present matter and enter into a guilty plea to a single count of Conspiracy to Defraud the United States, *see* Criminal Action No. 3:10-cr-1, in exchange for the dismissal of the indictment as to him in the instant case.

In preparation for his testimony, Mark Irwin participated in a proffer with the United States in January 2010 and in pre-trial preparation for his testimony in May 2010. During that time, Irwin

-2-

provided the prosecutors with information about Target Oil's operations, Michael D. Smith and Christopher Cello Smith's involvement in the scheme described in the Indictment, and his own involvement in the scheme.  The Court has reviewed, in camera, the notes taken during these sessions by government agents and finds no reference whatsoever to Irwin's employment with any oil and gas company other than Target Oil and certainly not a company known as Summit Energy Corp., a name which has become meaningful to the players in this case by now.

At some point, presumably during the pre-trial preparation sessions in May 2010, Irwin, through his attorney Patrick Nash, advised Assistant United States Attorney Frances Catron that he had been involved in activities similar to those undertaken by Target Oil in the scheme alleged in the Indictment although on behalf of another company.  Then, on May 31, 2011, Catron sent an email to all defense counsel which advised that, among other things:

> Mr. Nash, counsel for Mr. Irwin, advises that Irwin was involved for a short period of time as a salesman with another oil and gas company after leaving Target Oil and may have engaged in conduct arguably similar to the activities at Target Oil. Mr. Nash indicates that he may advise Mr. Irwin to assert his 5th Amendment privilege against self incrimination concerning this conduct.  Separate from Mr. Nash's provision of information, the United States has no knowledge of this conduct or this oil and gas company; however, no promises have been made to Mr. Irwin about forbearance from prosecution based on this conduct in the event of a subsequent criminal investigation.

Trial commenced in this matter in June 2010, and, on direct examination, Irwin claimed he was employed as a mechanic with his father making far less than he made while working at Target Oil. While on direct examination, the government brought out the fact that Irwin had a drug addiction problem and that he was testifying pursuant to a plea agreement. The government made no mention of Irwin's involvement "for a short period of time as a salesman with another oil and gas company after leaving Target Oil," as mentioned in AUSA Catron's email of May 31, 2010, but Defendants had every opportunity to question him about his work history and did. On cross-examination, there were efforts to impeach Irwin's credibility, discussion of his plea agreement with the government, and his drug addiction, as well as an affair with Michael Smith's daughter. He was cross-examined about employment with other oil companies and pointedly asked "Did you work for any other oil companies after you left Target Oil?" He denied doing so with the exception of a brief stint at Burch Oil.

During Irwin's testimony at trial, there was no mention of his involvement with a company known as Summit Energy Corp. and certainly no mention that he had secured $381,000 from investors utilizing the artifice of Summit Energy during the end of his tenure with Target Oil and, indeed, through the trial of this matter – which everyone now knows to be the case. No one denies that he lied at trial, although no one knew it then, when he

responded that he worked for "Burch Drilling" and "[t]hat was pretty much it." Undoubtedly, Irwin was given the chance to disclose the identity of the oil and gas company for which he worked after leaving Target Oil, as referenced in AUSA Catron's email of May 31, 2010, i.e., Summit Energy Corp., and he did not.

After the trial concluded and verdicts were returned, an investigation of Defendant Irwin's assets by the financial litigation unit of the United States Attorney's Office began. At that time, one or more bank accounts in the name of Mark Irwin and a company called Summit Energy were discovered. During that investigation by Paralegal Specialist Lynn Woodrum into the financial resources and assets of the defendants in this matter, on or about August 16, 2010, she discovered that Mark Irwin had one or more bank accounts in his name and/or the name of Summit Energy. Her discovery of that information and her report to Catron was the first time that Woodrum, Catron, or anyone in the office of the United States Attorney for the Eastern District of Kentucky had heard of the company, Summit Energy, and by extension, the accounts.[1] Only then did the United States request leave from this Court, which was obtained on September 1, 2011, for the disclosure of Irwin's Form CJA-23 by the United States Probation Office, and

---

[1] In the materials reviewed, *in camera*, the earliest reference by name to Summit Energy Corp. has to do with an investor complaint about Summit Energy Corp. received by state regulatory officials the week prior to Paralegal Woolums' discovery.

learn that Irwin had failed to disclose those Summit Energy Corp. assets on his form. The United States considered at length what to do about this issue, including whether to prosecute Irwin for his activities with respect to the investors in the Summit Energy Corp. scheme, as evidenced by their internal notes and emails. Ultimately, the government elected to prosecute him for the false statement and work to obtain restitution for the Summit Energy Corp. investors through the already existing cases against Irwin. Having ultimately obtained an immunity agreement with respect to his Summit Energy Corp. activities in multiple jurisdictions, Irwin pleaded guilty to an information on a count of making a false declaration before the Court in Criminal Action No. 11-cr-39.

**II. No Violation of *Brady v. Maryland or Giglio v. United States* with Respect to Evidence of Summit Energy Corp.**

Under *Brady* and its progeny, the prosecution must disclose all material exculpatory and impeachment evidence to a defendant. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Jells v. Mitchell*, 538 F.3d 478, 501-02 (6th Cir. 2008). This obligation includes a duty to disclose what is commonly referred to as "*Giglio* material" – "evidence that could be used to impeach the credibility of a witness." *Schledwitz v. United States*, 169 F.3d 1003, 1011 (6th Cir. 1999) (citing *Giglio v. United States*, 405 U.S. 150, 154-55 (1972)). Such evidence, necessarily, is to be turned over to the defendants "in time for use at trial." *Id.* at 1285. In other

words, the obligation to reveal this evidence is limited to those facts that are in the possession of the prosecution prior to trial.

As to such a motion, "[t]he question of whether to decide a motion on the supporting evidence filed with the motion or to hold an evidentiary hearing is within the discretion of the trial court." *United States v. O'Dell*, 805 F.2d 637, 642 (6th Cir. 1986) (*citing United States v. Hoffa*, 382 F.2d 856, 866 (6th Cir. 1967); *United States v. Metz*, 652 F.2d 478, 481 (5th Cir. 1981)).  The Court concludes that, in the instant matter, there is no need for an evidentiary hearing to permit them to present documentary materials related to Mark Irwin's activities with Summit Energy Corporation before the trial in this matter.  Rather, on the materials before it, the Court concludes that there was no violation of *Brady* or *Giglio* which would warrant a new trial.

Frankly, no one disputes that Irwin did what he did – i.e., that he ran Summit Energy Corp. much like Target Oil at the relevant times, that he lied on his Form CJA-23 about his involvement with Summit Energy Corp., and that he lied at trial about his work with Summit Energy Corp.  Nonetheless, the moving Defendants have provided the Court with no reason to permit them to examine the prosecutors, investigators, and Irwin's counsel, Patrick Nash, concerning their pre-trial and post-trial knowledge of Irwin's involvement with Summit Energy Corp., i.e., Irwin's involvement with "another oil and gas company" that was "arguably

engaged in similar conduct as Target Oil."

Again, it is undisputed that Attorney Nash made a vague disclosure to the government concerning Irwin's activities which prompted AUSA Catron to send her May 31, 2010, email. The Court has reviewed the United States' affidavits, presented in opposition to Christopher Cello Smith's earlier Motion for Disclosure of *Brady* and *Giglio* Material [DE 489], in which Defendant Michael D. Smith joined [DE 492], has had the benefit of the trial transcripts, and made an *in camera* review of the United States' files related to Mark Irwin, his pre-trial cooperation, his Form CJA-23 misadventures, and his involvement with Summit Energy Corp, as well as reviewed the materials submitted by Defendants. None of this persuades this Court that the United States knew anything about Summit Energy Corp. prior to August 2010 and certainly not before the trial of this matter.

The moving Defendants argue that a hearing is necessary because this Court cannot simply take the word of the government that there has been no *Brady* or *Giglio* violation. That would be true if there was evidence of a lack of candor on the part of the prosecution in this matter as there was in the case of *United States v. White*, 492 F.3d 380, 411-12 (6th Cir. 2007), upon which the moving Defendants rely. However, the instant case is distinguishable from that presented in *White*, where the evidence detailed the government's rather great lengths to deny Defendants

access to the requested documents and "effectively foreclosed them from making the requisite showing that the documents were material and favorable (whether exculpatory or impeaching), and [the defendants showed] that the suppression prejudiced them." *Id.* at 412. Here, there is no evidence whatsoever that the United States Attorneys' office or any government agent affiliated with the prosecution knew anything more about Mark Irwin's involvement with any other oil and gas business than what was revealed in AUSA Catron's May 31, 2010, email.

Certainly, it has been a great disappointment to these moving Defendants that the United States did not have more to disclose before trial. However, contrary to the moving Defendants' position, the United States had no "affirmative duty . . . to take action to discover information which it [did] not possess." *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007) (quoting *United States v. Beaver*, 524 F.2d 963, 966 (5th Cir. 1975)) (holding that no *Brady* violation occurred where government did not disclose fifteen boxes of evidence that were in personal control of cooperating witness and not disclosed by that witness until late in trial). A prosecutor has an obligation to learn of favorable evidence known to others acting on the government's behalf, but, in this regard, "cooperating witnesses. . . stand in a very different position in relation to the prosecution than do police officers and other governmental agents." *Id.* (citing *Kyles v. Whitley*, 514 U.S.

419, 437-38 (1995)).  Here, the information in question was in the "possession," for lack of a better word, of its cooperating witness – not one of the prosecution's own agents.  For this reason, the Court is not persuaded that this is an instance where the United States willfully ignored information which it would otherwise have been required to disclose under *Brady* and *Giglio* as taught in *United States v. Quinn*, 537 F.Supp.2d 99, 110 (D.D.C. 2008), upon which the moving Defendants rely.  Certainly, Irwin was a key government witness in describing the "scheme" which Target and the individual defendants were accused of perpetrating.  He was not, however, an agent of the government as was the witness in *Quinn*.  Thus, the United States disclosed what it knew to Defendants and had no obligation to do more on the facts presented in this matter.

Clearly, Defendants were provided with what information the United States had in its possession.  To the extent anyone – government and defendants alike – could have used that information to discover further facts about Mark Irwin and his activities with Summit Energy, no one chose to pursue it before Irwin's testimony at trial.[2]  Perhaps the prosecution, counsel for defendants, and

---

[2]   For what it is worth, the Court was able to connect Mark Irwin's home address listed in Count 26, the forfeiture count, of the Indictment to Summit Energy using the Google search engine.  By using the search term "742 Cove View Cir, Cookeville, Tn," a reference to "Summit Energy Corp." was the eighth result returned. <http://www.google.com/search?hl=en&source=hp&biw=1004&bih=638&q=+742+Cove+View+Cir%2C+Cookeville%2C+Tn&aq=f&aqi=&aql=&oq=> (last accessed June 9, 2011).  The Court was then able to locate information on Summit Energy Corp. using the Tennessee Secretary of

defendants chose to focus their energies elsewhere in the weeks leading up to trial or perhaps they did not believe it was meaningful to their case. This Court expresses no opinion as to whether that was a sound strategy, but it concludes that there was no violation of the government's duty to disclose all material exculpatory and impeachment evidence in its possession to the moving Defendants.

### III. No Violation of *Brady v. Maryland* or *Giglio v. United States* with Respect to Tacit Agreement of Forbearance of Prosecution

Further, there is no evidence that the United States failed to disclose a tacit agreement to provide Irwin with some leniency as to his Summit Energy Corp. activities in exchange for his testimony, as the moving Defendants argue. "It is well established that an express agreement between the prosecution and a witness is possible impeachment material that must be turned over under *Brady*." *Akrawi v. Booker,* 572 F.3d 252, 262-63 (6th Cir. 2009) (quoting *Bell v. Bell*, 512 F.3d 223, 233 (6th Cir. 2008) (*en banc*)). Indeed, "[t]he existence of a less formal, unwritten or tacit agreement is also subject to *Brady's* disclosure mandate." *Id.* In this way, "*Brady* is not limited to formal plea bargains,

---

State's website. *See* <http://www.tn.gov/sos/bus_svc/> (last accessed June 9, 2011). The Court does not know with certainty whether that information was available on the Internet prior to the trial of this matter, but it underscores the Court's belief that this information was equally available in the public domain for those who would go looking for it. Neither access to special databases nor information beyond that contained in the indictment, i.e., Mark Irwin's home address, was required to find it.

-11-

immunity deals or other notarized commitments. It applies to 'less formal, unwritten, or tacit agreement[s],' so long as the prosecution offers the witness a benefit in exchange for his cooperation, . . . so long in other words as the evidence is 'favorable to the accused.'" *Harris v. Lafler*, 553 F.3d 1028, 1034 (6th Cir. 2009) (quoting *Bell,* 512 F.3d at 233, and [*United States v.*] *Bagley,* 473 U.S. [667,] 678 [(1985)]).

With respect to Irwin, the moving Defendants insist that the information that they have in hand strongly suggests that there must have been an undisclosed arrangement or a "deal" between the government and Mark Irwin whereby he would testify in exchange for the government's forbearance from prosecution for any wrongs committed during his actions while operating Summit Energy Corp. The Court disagrees, for much like in *Bell*, there is no evidence of such a tacit agreement in this case.

Here, no one disputes that, at some point prior to trial, Irwin – through his attorney, Nash – unilaterally told prosecutors that, in addition to his activities at Target Oil & Gas, he had been involved in activities with another company (now known to be Summit Energy Corp.) which mirrored those charged in the scheme set forth in the indictment in 3:08cr31. This was memorialized in AUSA Catron's email disclosure to defense counsel on May 31, 2010. Internal notes and emails by and between counsel and case agents show that the United States considered long and with varied

opinions over the course of time as to how to proceed. All of that said, there is no evidence that the United States ever thought it would or should give Irwin a break on the Summit Energy Corp. scheme in exchange for his cooperation in this matter.

In *Bell*, the Sixth Circuit held that there was no evidence of an agreement between prosecutors and a cooperating witness where the evidence consisted of notes, taken by the prosecutor during his discussion with the witness, which indicated that the witness had unilaterally contacted the district attorney's office to provide assistance in the case, a note indicating that the witness wanted to be sent to a particular facility, an apparent outline of the witness' scheduled prison release dates, and a reference to a work release program. From those notes, the Sixth Circuit concluded that one could intuit that the witness wanted favorable treatment in exchange for his assistance, but the evidence demonstrating that one party wanted something did not – without more – indicate that the other party agreed. Such evidence was not enough, in *Bell*, to create evidence of an agreement. Nor is it sufficient evidence here.

As pointed out elsewhere by the Court, there is *no* evidence that the government knew any details, including the name of the corporation, let alone anything more than the barest contours of Irwin's actions as part of Summit Energy Corp., until well after the trial of this matter. The only indication from the period

prior to trial as to what the United States intended to do with respect to any involvement in another scheme by Mark Irwin was that the government had offered him no leniency or "deal" with respect to those matters in exchange for his cooperation in this matter – or anything else.  Nor is there any suggestion from the materials reviewed *in camera* which post-date that disclosure that the United States ever "gave" Irwin leniency for his cooperation with respect to the Summit Energy scheme.

Frankly, the Court is not persuaded that there exists even the shadow of a "less formal, unwritten or tacit" agreement between the government and Irwin simply because the government, many months later, evaluated the information it had gleaned about Irwin and Summit Energy Corp., post-trial, then – for any number of reasons – decided not to prosecute those alleged wrongs, assured him by virtue of an immunity agreement that he would not be prosecuted for his involvement with Summit Energy Corp, and negotiated a guilty plea for misrepresentation with respect to his fraudulent Form CJA-23.  These facts do not demonstrate that there existed a tacit or informal agreement dating from the period *prior to trial* that the government would provide Irwin with leniency for any crimes committed under the auspices of Summit Energy Corp.  That being the case, there was nothing to disclose in this vein prior to trial, and no violation of *Brady* or *Giglio* occurred which would warrant a new trial.

**IV.   No New Trial is Warranted by Newly Discovered Evidence**

Finally, Defendants argue that a new trial is necessary because they now have evidence that Mark Irwin lied to the Court on his Form CJA-23, lied about his involvement with Summit Energy Corp., and was, simply, involved in a scheme that sought to deceive investors with respect to Summit Energy Corp.  The Court is not, however, persuaded that a new trial is required by the interest of justice pursuant to Fed. R. Crim. P. 33 on the basis of newly discovered evidence.  In the first instance, "motions for a new trial based on newly discovered evidence are disfavored." *U.S. v. Hawkins,* 969 F.2d 169, 175 (6th Cir. 1992).  This Court will only grant a new trial based on newly discovered evidence if (1) the new evidence was discovered after the trial, (2) the evidence could not have been discovered earlier with due diligence, (3) the evidence is material and not merely cumulative or impeaching, and (4) the evidence would likely produce an acquittal. *U.S. v. Braggs,* 23 F.3d 1047, 1050 (6th Cir. 1994) (citing *U.S. v. Barlow,* 693 F.2d 954, 966 (6th Cir. 1982)).  Considering this standard, the Court is not persuaded that the moving Defendants can demonstrate that the circumstances merit a new trial.

In the first instance, while there is no doubt that the evidence was not discovered until after the trial, the Court is not persuaded that the evidence of Mark Irwin's involvement with Summit Energy Corp. could not have been discovered prior to trial with due

diligence, as set forth above. Further, all of the evidence in question is "impeaching" and not material. In this regard, the Court rejects Michael D. Smith's argument that the jury could have logically concluded that the conduct Irwin described at trial "as a supposed agent of Target Oil was actually carried out on behalf of his own company, Summit Energy." There was simply too much evidence presented with respect to the operations of Target Oil & Gas by many witnesses as to the actions of many different people, including Michael D. Smith and Christopher Cello Smith, for a reasonable juror to draw the conclusion that Michael D. Smith suggests.[3] The evidence is thus, at best, impeaching.

Finally, the Court considers the argument that the jury's evaluation of the case would have been significantly impacted and the outcome different, i.e., an acquittal would have been achieved, with presentation of (1) evidence of Irwin's willingness to lie to the Court by virtue of his misrepresentations on his Form CJA-23; (2) evidence that Irwin perjured himself during his trial testimony, i.e., that he lied about his employment and activities when he failed to disclose in response to questions about his

---

[3] Further, while the wisdom of trial counsel's tactical decisions is not an issue before the Court today, the Court is puzzled by the idea that Michael D. Smith would have wanted to portray actions taken by Mark Irwin in persuading investors to participate in Summit Energy Corp.'s scheme as wrongful when he took the position that similar or nearly identical actions taken by him or his agents were just those of a man doing business and good business at that.

employment that he was running a company that was, as moving Defendants' describe it, an illicit oil and gas operation; and (3) evidence that he sought to defraud Summit Energy Corp.'s investors.

The Court is not, however, persuaded that it would have changed the jury's mind as to the allegations against Defendants had they known that Mark Irwin lied on his Form CJA-23 or with respect to his activities with Summit Energy Corp or even that he carried out those activities.  At trial, his reputation was thoroughly excoriated by cross-examination as to his drug use and his romantic involvement with Michael D. Smith's daughter while Irwin was married to another woman and with the disapproval of Michael D. Smith.  Defendants thoroughly explored his tendency and motivations to lie based on that evidence.  Of course, the Court does not believe that evidence of his use of drugs or his unfaithfulness to his wife (and his boss, as some might see the situation) are substitutes for evidence of his other deceptions or activities, but no one denies that Defendants were given an opportunity – with the knowledge that they had at the time of trial – to thoroughly cross-examine Mark Irwin on these other issues.  When this matter was presented to the jury, no one believed that Mark Irwin was squeaky clean.

Further, while his co-defendants were not able to cross-examine him about his lack of truthfulness to the Court or the jury or his lack of scruples about continuing his smooth-talking ways

with investors under the auspices of Summit Energy Corp., the Court still does not believe that this evidence would have changed the outcome. While the jury might have doubted his testimony about training the employees and some callroom conduct, it is a different story with respect to the essentials of the scheme, including misrepresentations made to investors about the placement of wells and the potential for production from those wells intended to induce their investment in the scheme – because Mark Irwin was not the only witness. Rather, what Irwin described about these activities was backed up time and time again and often better described by investors who testified about what they were told over the phone and in written material, as well as recordings of conversations between Target agents (including Christopher Cello Smith) and investors (or regulators disguised as potential investors), the testimony of individuals who observed the results (or lack thereof) of well exploration, the preparation of materials to be provided to investors, and the general conduct of Target Oil & Gas under the leadership of Michael D. Smith – including regulatory investigator Baldemar Quintanilla; investors Vincent Guerrieri, Dorothy Dean Meade Caldwell, Daniel Grethen, and others; geologist and co-defendant Ray Garton; coworkers Shannon Williams and Christopher James Holsapple; and many, many others. The Court concludes that this "newly discovered" evidence would not, had it been presented at trial, have yielded a different outcome. Thus,

no new trial is warranted.

## V. Conclusion

For all of the reasons stated above, the Court concludes that there has been no violation of *Brady* and *Giglio* nor has newly discovered evidence been unearthed which would merit a new trial in this matter.

Accordingly, **IT IS ORDERED** that Defendants Michael D. Smith and Christopher Cello Smith's Motions for New Trial [DE 523 and 528] are **DENIED**.

This the 13th day of June, 2011.



Signed By:
*Joseph M. Hood*
United States Senior Judge